# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW LARIVIERE, | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 16-12444-FDS |
| v. | ) |
| NANCY BERRYHILL,<br>Acting Commissioner<br>of the Social Security Administration, | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Acting Commissioner of the Social Security Administration ("SSA") denying plaintiff Andrew Lariviere's application for Supplemental Security Income ("SSI") and Child Insurance Benefits ("CIB").[1] Lariviere appeals the denial of his application on the ground that the administrative law judge ("ALJ") erred in discounting the opinions of his treating and consultative physicians.

Lariviere has moved to reverse the decision of the Acting Commissioner, and defendant has cross-moved to affirm the decision of the Acting Commissioner. For the reasons stated below, the decision will be affirmed.

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and has therefore been substituted as a party pursuant to Fed. R. Civ. P. 25(d).

I.  **Background**

   A.  **Factual Background**

Andrew Lariviere was 26 years old at the time of his hearing on September 16, 2015. (A.R. 35, 38). He graduated from Bridgewater State University in 2013 with a major in English and a minor in Secondary Education. (A.R. 39, 44). He has no work experience and lives with his parents in Massachusetts. (A.R. 39, 221-22).

   1.  **Medical Evidence from Examining Physicians**

The earliest record of treatment of Lariviere dates back to December 2012, when he reported anxiety to his primary-care physician, Dr. Felicia Freilich. (A.R. 272-73).[2] At that appointment, Dr. Freilich noted that the onset of his anxiety was "many years ago, likely around age 5," that its status was "improving, chronic," and that he denied "anxiety, depressed mood, [and] panic attacks." (A.R. 272). At that time, Lariviere was taking a daily 40 mg dose of Celexa (citalopram hydrobromide) for anxiety and OCD. (*Id.*). Dr. Freilich noted that his anxiety had "[i]mproved significantly on Celexa" and that his OCD was "much improved on Celexa." She noted that his mother reported that "Celexa has helped Andrew immensely—anxiety is better OCD-type behaviors are better. He is back to himself—laughing, joking, etc." (*Id.*). In her general psychological evaluation, she noted that he was "still with odd, Asperger-type affect, somewhat flat—HOWEVER, much brighter than before. Made a couple jokes, more interactive than previous." (*Id.*). Dr. Freilich noted that he was not seeing a therapist, but that she "[a]gain, offered referral to group therapy for Asperger's and social interaction, but pt. declined." (*Id.*).

---

[2] He reported that his first visit with Dr. Freilich's office was in October 2010, but there are no treatment records from that time. (A.R. 249). Dr. Freilich reported that she first examined Lariviere in June 2011. (A.R. 295).

Lariviere continued to see Dr. Freilich for primary care. He had a physical examination on January 10, 2013, at which Dr. Freilich noted that he was "[d]oing well overall—much more functional since he started on the Celexa." (A.R. 270). As to his OCD, she noted that he was "[d]oing very well on Celexa—this is probably the most calm I have ever seen him. Mom very happy with his progress—OCD-type behaviors are much improved." (*Id.*). She also noted: "odd affect (this is his baseline with the Aspergers), does seem a lot more calm though, cognitive function intact, cooperative with exam." (A.R. 271).

At his next physical on January 16, 2014, Dr. Freilich noted that Lariviere's "[m]ain issue is his Aspergers, OCD, anxiety which is making it very difficult for him to get a job." (A.R. 268). She noted that he was "[d]oing very well on Celexa in terms of his OCD-type behavior, however, the anxiety and social difficulty typical for Asperger are still present." (*Id.*). She also noted that he "[f]eels well. Mom wants him to apply for disability. Pt. says he is doing well on the Celexa in terms of his anxiety." (*Id.*). And she noted "poor eye contact, affect flat, affect restricted (baseline for him)." (A.R. 269). [3]

On March 14, 2014, Lariviere saw Dr. Timothy Horton for a psychodiagnostic interview upon referral from the Massachusetts Rehabilitation Disability Determination Services. (A.R. 279-81). Lariviere reported that he had a friend, but that he is lonely, and that he drives regularly. (A.R. 279-80). Dr. Horton described Lariviere's daily activities as:

> Able to manage personal care independently, Mr. Lariviere is also capable of performing all household chores. He knows how to use both a cell phone and the Internet. Interests/hobbies are video games and Internet (for information and social networking). Capacity to focus/concentrate is described as adequate. During the past two weeks, out-of-home activities were shopping, visiting friends/relatives, exercising, and eating at a restaurant.

(A.R. 280).

---

[3] The primary-care treatment notes also document Lariviere's obesity. (A.R. 268, 270).

With respect to his mental status, Dr. Horton described him as "poised and humorless," "[m]aintaining normal eye contact," "cooperative," "[a]lert and well oriented," and that his "affect is congruent to thoughts with normal intensity and limited range." (A.R. 280-81). Dr. Horton administered a mini-mental state evaluation, and Lariviere scored 29/30, "which is above the recommended cutoff score for identifying cognitive impairment." (A.R. 280). Dr. Horton noted that his "[c]ognitive ability is estimated to be above average," that his "[l]ong-term memory is intact," that his "[s]peech is rapid but otherwise normal," and his "[e]xpressive language skills are well-developed." (*Id.*). As to his anxiety, Dr. Horton noted: "Obsessive content and compulsive tendencies are reported. Mood is described as apprehensive (anxiety in some types of social settings, e.g., student teaching, public speaking)." (*Id.*).

Dr. Horton diagnosed "Social Phobia (300.23); rule-out other Anxiety Disorders," obesity, and "occupational and economic problems." (A.R. 281). He assessed a global assessment of functioning ("GAF") score of 60. (A.R. 281). He concluded as follows:

> With regard to employment, Mr. Lariviere is capable of asking questions, requesting assistance, understanding and recalling work procedures, and meeting hygiene standards. Symptom (social anxiety in specific types of settings) interference may negatively impact attendance, work/rate persistence, tolerance for change/stress, and capacity to sustain working relationships with coworkers and supervisors.

(*Id.*).

On July 18, 2014, Dr. Freilich submitted a DDS questionnaire in which she noted that "Andrew has Asperger's syndrome and OCD—both of which make it <u>very</u> difficult to function socially in a work environment." (A.R. 295). In response to a prompt requesting information as to whether his condition had worsened or changed, she stated: "Andrew continues to exhibit classic Asperger-type behavior—difficulty reading social cues, difficulty interacting with others. He also has significant anxiety and OCD, which is treated with medication. While the

4

medication does help with the anxiety and OCD, Andrew would have a very hard time functioning in a work environment." (A.R. 296).

At his February 6, 2015 annual physical examination, Lariviere reported to Dr. Freilich that his "[m]ain concern is worsening OCD—doesn't think the Celexa is working anymore." (A.R. 308). She also noted "odd affect, poor eye contact, mood depressed, anxious-appearing, alert, oriented, cognitive function intact, cooperative with exam." (A.R. 310). As to his OCD, Dr. Freilich wrote:

> Pt has finally agreed to see psychiatry (I have tried to refer him several times over the years), so I have given him a list of psychiatrists to call and schedule an appt. I think that pt would benefit from Abilify or another atypical antipsychotic, but would prefer for pt to be following by psychiatry. Pt admittedly has only agreed to see psychiatry since he was denied SSI.

(A.R. 310-11).

Lariviere saw Dr. Gabriela Velcea, a psychiatrist, for an evaluation on June 19, 2015. He reported to her that "his emotional struggles have been increasingly more severe in the past year or so, to the point of rarely leaving the house," and that the Celexa "was initially helpful, but lately doesn't seem to help as much." (A.R. 335-36). She diagnosed PTSD, OCD, and Asperger's disorder and assessed a GAF of 55. (A.R. 339). She increased his dose of Celexa to 60 mg. and "recommended individualized therapy ASAP." (*Id.*). It appears, however, that Lariviere did not want therapy, because she also made a note to follow up with "therapist referral if pt. decides to accept it." (*Id.*).

Lariviere saw Dr. Velcea two more times. On July 6, 2015, she noted that his condition had "[i]mproved," and that she had explained to him and his mother the "need for cognitive restructuring, basic CBT principles." (A.R. 340). On August 17, 2015, she again noted that his condition was "[i]mproved" and that he "reports he has been doing better, anxiety diminished, able to function better, although he is not doing too much outside the house." (A.R. 341). In

5

addition to the 60 mg. dose of Celexa, she prescribed Ativan "for anxiety before known triggers." (*Id.*).

## 2. Function Reports

Both Lariviere and his mother submitted reports on his functioning and activities in connection with his initial application for benefits. (AR. 227, 234). His mother indicated that he "eat[s], cook[s], plays video games, enjoys his cats, watches TV, does some chores, sleeps at various times no set sleep pattern," and that his hobbies include "creating a computer game" and "drawing." (A.R. 227, 231). She noted that he feeds, grooms, and cleans the litter box for his cats. (A.R. 228). She indicated that he is capable of his own personal care, but that he is "not very concerned about his hygiene" and "has to be constantly reminded & pushed to bathe & change clothes." (*Id.*). With respect to chores, she wrote that he does cleaning and laundry but needs "constant reminder[s]" and it "could take days to get him to do them[;] Never finishes anything he starts." (A.R. 229). She noted that he also does grocery shopping every week and that "he is great at groceries." (A.R. 230).

On his own function report, Lariviere noted that he "surf[s] the internet," "prepare[s] meals," "watch[es] television," and "play[s] videogames." (A.R. 234). He stated that those activities are often "followed by chores and cleaning," and "[u]sually [he] nap[s] for several hours in between." (*Id.*). He reported "[n]eurotic behavior while changing clothing" and "[o]ccasional neurotic behavior in everyday activities." (A.R. 237). He stated that he prepares meals daily and goes grocery shopping. (A.R. 238-39). He reported doing various household chores such as "[d]usting, vacuum, picking up, laundry, [and] dishes," taking "[u]sually less than 10 or 20 minutes for each" but "will oftentimes slack off or forget so pestering or reminders from family is often crucial." (A.R. 238). He reported "watching television, playing videogames,

6

reading comics, surfing the internet, [and] writing stories," and that he "spend[s] time with family" and "occasionally meet[s] with friends." (A.R. 240). He noted that he can follow written instructions "without issue, usually turns out fine," but will "often question" spoken instructions for specifics. (A.R. 241). He also reported that his "neurotic thoughts affect focus and concentration," that he handles stress badly, and does not like people to touch his head. (A.R. 241-42).

### 3. Medical Evidence from Non-Examining Physicians

Lariviere's medical records were evaluated by two non-examining DDS physicians. On April 17, 2014, in connection with his initial claim, Dr. Menachem Kasdan reviewed the treatment records from Dr. Freilich and Dr. Horton and reports from Lariviere and his mother. (A.R. 76, 77-78). He determined that Lariviere was moderately limited in several areas of social interaction, and "[m]ay do better in a setting working independently w/limited need for social interactions and w/a supportive supervisor." (A.R. 82). He also determined that Lariviere was moderately limited in his ability to maintain attention and concentration, and "[m]ay be somewhat distracted, but appears able to maintain adequate concentration/pace to simple tasks for 2 hour intervals in an 8 hour day." (*Id.*).

On August 25, 2014, in connection with Lariviere's request for reconsideration, Dr. Judith Clementson reviewed the treatment records from Dr. Freilich and Dr. Horton, reports from Lariviere and his mother, and Lariviere's remarks that the job-application process had caused an increase in his OCD behavior and stress. (A.R. 96-99, 102). She also determined that he was moderately limited in his social interactions, and that he would "require a setting working independently w/ limited need for social interactions and with a supportive supervisor." (A.R. 104). She concluded that he would be able to "[u]nderstand and remember simple tasks";

7

"[s]ustain attention and pace at simple tasks for 2/8/40 in a job with limited social interaction demands"; "[r]elate adequately to a small number of familiar co-workers and a supportive supervisor"; and "[u]nderstand and respond to simple change." (A.R. 105).

### 4. **Hearing Testimony**

The SSA conducted a hearing concerning Lariviere's application for benefits on September 16, 2015. (A.R. 35). At the hearing, Lariviere appeared and testified before the ALJ. (*Id.*). Attorney Amanda DelFarno represented Lariviere at the hearing. (*Id.*).

Lariviere testified that he had never been employed. (A.R. 41). He had tried to do some student teaching as part of his college program, but he found it too stressful and he had to quit and give up his major in secondary education. (A.R. 41-42). He was never enrolled in special-education classes, and did not require educational accommodations for his college coursework. (A.R. 40). He testified that since receiving his degree in English he has not looked for work because the intensity of his condition was "beginning to peak again." (A.R. 45). He testified that he has trouble walking through doorways, especially while carrying something, (A.R. 45, 57), and that he dwells on negative memories, (A.R. 46). He explained that the 60 mg dose of Celexa led to "small improvements" but he feels that it's a "temporary fix" and "some days, if I'm really messed up, it doesn't help that much." (A.R. 49-50). He testified:

> The reason why I'm so inactive most of the time is because I'm often either—I've either experiencing some sort of—some sort of neurotic behavior or thoughts. Or I'm afraid to—or I'm terrified of doing something that could set it off, or that could cause it. It's like—it's like I'm either in the middle of it, or living in fear of it.

(A.R. 55).

He testified that his sleep schedule is very irregular—sometimes he sleeps at night and sometimes during the day. (A.R. 52). He testified that he does drive but he prefers familiar routes, and his parents drove him to the hearing. (A.R. 47-48). As to his daily activities, he

8

testified that he surfs the Internet, plays video games, "occasionally do[es] errands," and naps. (A.R. 53). He gets out of the house "[s]everal times a week to do some errands . . . like grocery shopping, maybe returning stuff for people," and sometimes, when he has no choice, driving his father to appointments. (A.R. 54). He testified that the last time he saw his one friend was two or three months ago, and that he does not use social media. (A.R. 59-60, 62-63).

Larry Takki, a vocational expert, also testified at the hearing. The ALJ asked Takki to consider a hypothetical person of Lariviere's age and education, with no work experience, who had no exertional limitations but was "limited to routine tasks with no detailed instructions," "could not tolerate more than superficial interaction with the public, supervisors, or coworkers," and "could tolerate only occasional passage through doorways, and no work in confined spaces." (A.R. 69). Takki testified that such a person could perform jobs in the national economy, such as working as a hand packer, industrial cleaner, or price marker. (A.R. 70). When asked whether the same hypothetical person who also was "absent three or more days per month on a consistent basis" could work in the national economy, Takki testified that that person could not. (A.R. 70-71). Lariviere's attorney then asked whether there would be work in the national economy for the person of the first hypothetical with the additional restriction that the person could not be within 10-15 feet of other people. (A.R. 71-72). Takki testified that such a person could work as a hand packer, industrial cleaner, or office cleaner. (A.R. 72-73).

B. **Procedural Background**

On January 28, 2014, Lariviere filed an application for Child Insurance Benefits alleging disability beginning July 10, 1989, the day he was born. (A.R. 192).[4] His claim of disability was

---

[4] To be eligible for CIB on the earnings record of an insured person entitled to old-age or disability benefits or who has died, the claimant must: (1) be the insured person's child, (2) be dependent on the insured, (3) apply for benefits, (4) be unmarried, and (5) as relevant here, have a disability that arose before he became 22 years old. 20

9

based on Asperger's syndrome, obsessive-compulsive disorder, and anxiety. (A.R. 79, 225). He applied for Supplemental Security Income on February 3, 2014. (A.R. 194).

The SSA originally notified Lariviere on April 18, 2014, that it had denied his claims for disability benefits. (A.R. 94-95; 123-24). Lariviere filed for reconsideration on May 5, 2012. (A.R. 129-31). The SSA affirmed its denial on August 27, 2014. (A.R. 121-22, 133-35). On September 17, 2014, Lariviere requested a hearing, which was held on September 16, 2015. (A.R. 139-41, 35).

On November 4, 2015, the ALJ issued an opinion finding that Lariviere was not disabled under sections 223(d) and 1614(a)(3)(A) of the Social Security Act. (A.R. 15-28). After allowing him extra time to submit additional information, the Appeals Council denied his subsequent request for review on October 17, 2016. (A.R. 1-3, 6-7).

On December 1, 2016, Lariviere filed this action to review the Acting Commissioner's decision. On June 9, 2017, he moved to reverse the decision. On August 24, 2017, the SSA cross-moved for an order affirming the Acting Commissioner's decision.

## II. Legal Standards

### A. Standard of Review

This Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

---

C.F.R. § 404.350(a). The disability must have been continuous and uninterrupted from before age 22 and the date on which the claimant applies for benefits. *Suarez v. Sec'y of Health & Human Servs.*, 755 F.2d 1, 3 (1st Cir. 1985).

In applying the "substantial evidence" standard, the reviewing court must bear in mind that the ALJ, not the courts, finds facts, decides issues of credibility, draws inferences from the record, and resolves conflicts of evidence. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F, App'x. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue, are reviewed *de novo*. *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

**B.   Standard for Entitlement to Disability Benefits**

In order to qualify for SSI benefits or CIB, the claimant must demonstrate that he is "disabled" within the meaning of the Social Security Act. The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the

regulations promulgated under the statute. *See* 20 C.F.R. §§ 404.1520, 416.920. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in that national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's residual functional capacity ("RFC") in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. §§ 404.1560(c), 416.960(c).

### III. Analysis

#### A. The ALJ's Findings

In evaluating the evidence, the ALJ here conducted the five-part analysis called for by Social Security Act regulations.

At step one, the ALJ found Lariviere had not engaged in substantial gainful activity since the alleged onset date of July 10, 1989. (A.R. 21).

At step two, the ALJ found that Lariviere's anxiety disorder, obsessive compulsive disorder, Asperger's disorder, and pervasive developmental disorder were severe impairments under 20 C.F.R. §§ 404.1520(c), 416.920(c). (*Id.*). He further found that the record reflected obesity and hyperlipidemia, but these impairments were not severe. (*Id.*).

At step three, the ALJ found that Lariviere did not have an impairment or combination of impairments that medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. 21-23). The ALJ found that he no more than a moderate restriction in daily life activities due to his mental symptoms. (A.R. 21). In making that finding, the ALJ cited Lariviere's own testimony, as he reported meal preparation, cleaning, chores, taking care of pets, driving, shopping, socializing, reading, playing video games, surfing the Internet, and writing stories, among other activities found in the record. (*Id.*). The ALJ did find that Lariviere had marked difficulties in social functioning due to his anxiety and Asperger affect. (A.R. 22). Medical records and Lariviere's own reports indicated no more than moderate difficulties with regard to concentration, persistence, or pace. (*Id.*). The ALJ also found that he had not experienced any episodes of decompensation for an extended duration. (A.R. 22-23).

The ALJ determined that Lariviere "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is

13

limited to routine tasks not involving detailed instructions; is limited to no more than superficial interaction with supervisors, coworkers, and the public; can only occasionally be within 10-15 feet proximity to other people; and is limited to no more than occasional passage through doorways, and must avoid work in confined spaces." (A.R. 23). In making that determination, he found that the "longitudinal objective medical evidence does not support the claimant's subjective allegations of totally disabling mental symptoms" and relied on "primary care doctor treatment records showing improved symptoms on medications until 2015 and containing few accompanying abnormal objective mental status findings, generally normal objective mental status findings during consultative psychological examination, not seeking dedicated mental health treatment until very recently in 2015 despite being offered it multiple times over the years, and these 2015 treatment records show repeated objective findings of intact attention." (A.R. 24).

At step four, the ALJ found that Lariviere has no past relevant work to consider. (A.R. 27).

At step five, the ALJ found that jobs that Lariviere could perform, based on his age, education, work experience, and residual functional capacity, existed in significant numbers in the national economy. (A.R. 27-28). The ALJ relied on the vocational expert's testimony that someone with his same characteristics could work in representative unskilled occupations such as an industrial cleaner, or price marker. (*Id.*).

The ALJ accordingly found that Lariviere did not suffer from a disability under sections 223(d) and 1614(a)(3)(A) of the Social Security Act. (A.R. 28).

**B.     Plaintiff's Objections**

Lariviere contends that the ALJ's decision is not supported by substantial evidence and

should be reversed. Specifically, he asserts that the ALJ inappropriately discounted the opinions of his treating and consultative physicians in the analysis of his residual functional capacity.

In making an RFC determination, a treating source's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" may be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See also Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007). The regulations permit ALJs to give lesser weight to an opinion from a source where it is "internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (citing 20 C.F.R. §§ 404.1527(d)(2)-(4), 416.927(d)(2)-(4)). When a treating source is not given controlling weight, ALJs are "granted discretion to resolve any evidentiary conflicts or inconsistencies." *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014). Opinions that are not given controlling weight are evaluated based on the length, nature, and extent of the treatment relationship; support from medical evidence; consistency of the opinion with the record; and specialization of the doctor. 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ must give "good reasons" for the weight assigned to a treating source's medical opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), although "the regulations do not require an ALJ to expressly state how each factor was considered," *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 177 (D. Mass. 2015). Those "good reasons" must be supported by substantial evidence.

The only opinion evidence in the record from Dr. Freilich are her July 2014 statements that Lariviere's Asperger's syndrome and OCD "make it <u>very</u> difficult to function socially in a work environment" and that, while medication is helping, he "would have a very hard time

15

functioning in a work environment." (A.R. 295-96). The ALJ gave that opinion "little weight" because it was akin to a "[b]lanket statement[]" of disability and did not specify what was meant by "hard time functioning." (A.R. 26). The ALJ explained that the "longitudinal objective medical evidence" did not support total disability, pointing to Dr. Freilich's own treatment records showing "improved symptoms on medication until 2015"; Dr. Horton's generally normal mental-status findings, including a finding that Lariviere scored 29/30 on a mini mental status exam; the fact that Lariviere "did not seek dedicated mental health treatment until very recently in 2015 despite being offered it multiple times over the years"; and the fact that the 2015 treatment records showed intact attention. (*Id.*). Furthermore, the ALJ noted that Lariviere's own reports of his daily activities are inconsistent with a finding of total disability—that "despite his mental impairments, he reported performing an array of activities including cooking, chores, taking care of pets, driving, shopping, reading comics, playing videogames, surfing the [I]nternet for hours, watching television, writing stories, some socializing with friends and family, going out to eat, and he was able to earn his college degree." (*Id.*). Those are legitimate reasons to give "little weight" to Dr. Freilich's bare-bones opinion that Lariviere would "have a very hard time functioning in a work environment," and they are well-supported by the administrative record in this case.

Lariviere also complains that the ALJ improperly discounted the opinion of Dr. Horton. While Dr. Horton examined Lariviere, he did so only for the purposes of his benefits application and therefore is not considered a "treating physician" under the regulations. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Dr. Horton opined that his social anxiety "may negatively impact" his attendance, work rate, stress tolerance, and relationships with coworkers, but that he "is capable of asking questions, requesting assistance, understanding and recalling work

16

procedures, and meeting hygiene standards." (A.R. 281).

The ALJ decided to give "some but not total weight" to the opinion of Dr. Horton, for many of the same reasons he discounted Dr. Freilich's opinion. (A.R. 25-26). The ALJ noted that Dr. Horton did not "indicate specifics, for example, how long [he] believes the claimant could persist at a task or percentage of the workday he would be able to interact with others." (A.R. 26). And the ALJ reasoned that "[t]otal disability is not supported by the longitudinal objective medical evidence and several of the claimant's own reports/admissions, rather they support the ability to perform at least such a range of work activity as set forth in the residual functional capacity." (*Id.*). Nevertheless, because of the evidence of anxiety, Asperger affect, and Lariviere's reports of OCD behavior contained in Dr. Horton's report, the ALJ included in his assessment of Lariviere's residual functional capacity limitations to routine tasks, no more than superficial interaction with other people, only occasionally working within 10-15 feet of other people, and only occasionally walking through doorways. (A.R. 25). As with Dr. Freilich's opinion, the longitudinal medical evidence referenced by the ALJ above and Lariviere's own reports of his activities are substantial evidence to support the weight the ALJ gave to Dr. Horton's opinion.

The Court therefore sees no error in the ALJ's evaluation of the opinions of either Dr. Freilich or Dr. Horton. Lariviere complains that the ALJ's residual functional capacity determination did not fully capture the limitations noted by those doctors. But the ALJ was justified in giving those opinions the weight that he did, and, in any event, merely pointing to some conflicting evidence in the record is not sufficient to establish error under a substantial evidence standard. *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.

1987).[5]

## IV. Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and defendant's motion to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor, IV
Dated: December 15, 2017                    United States District Judge

---

[5] Lariviere's brief also includes a one-sentence assertion that: "The ALJ's reliance on the DDS physicians is misplaced." (Pl. Mem. in Supp. Mot. to Remand at 11). As he has failed to develop this argument, the Court considers it waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").